IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

ANTHONY CARNETTE,                    )
                                     )
            Plaintiff,               )
                                     )
v.                                   )         No. 2:07-CV-239
                                     )
EXIDE TECHNOLOGIES, INC.             )
                                     )
            Defendant.               )

## MEMORANDUM

Now before the court is the motion for summary judgment [doc. 14] filed by

defendant Exide Technologies, Inc. Plaintiff has responded to the motion [docs. 18-19], and

defendant has submitted a reply [doc. 24].

Also before the court is "Defendant's Motion to Strike the Summary Judgment

Affidavit of Anthony Carnette" [doc. 25]. Plaintiff has responded [docs. 27, 28, 32], and

defendant has submitted a reply [doc. 33].

For the reasons that follow, both motions will be granted. This civil action will

be dismissed.

I.

*Background*

Defendant operates a battery manufacturing plant in Bristol, Tennessee.

Plaintiff, an African-American male, was hired by defendant as a second shift machine

operator in June or July of 2004. During the time period relevant to this case, Roy Fanning

was plaintiff's direct supervisor, Travis Hart was the second shift production manager, Allen Cain was the plant manager, and Tom Borie and Derrel Hitchman were human resources managers or directors.

Plaintiff contends that, on the basis of his race, defendant subjected him to disparate treatment, retaliation, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, and 42 U.S.C. §§ 1981 and 1981(a). Plaintiff alleges that most of his problems began in late 2004 after it became known that he was being considered as a potential candidate for promotion to a "future" supervisory position. Specifically, plaintiff contends that he suffered discrimination, harassment, and retaliation as shown by the following circumstances.

1. Defendant "discriminatorily reduced" his pay from "$10.20 per hour 'plus production'" down to $7.98 per hour "without advising him of the decrease."

2. In a three-week period in March 2005, clothing was stolen from his locker, the locker was vandalized with "KKK" and "nigger" graffiti, and similar notes were slipped into the locker. Plaintiff suspected that coworker Michael Carrico was behind these events.

3. In April 2005, Cain failed to discuss with plaintiff the issue of his potential promotion, even though Borie had suggested that Cain do so.

4. In either April or July of 2005, coworker Daniel Horsey called plaintiff a "coon" in front of other employees.

5. During the summer of 2005, plaintiff observed "what appeared to be 'snot' on his locker."

6. Also during the summer of 2005, the gas tank of plaintiff's truck was "punctured while in the company's parking lot."

2

7. Plaintiff and Carrico were assigned to regularly work together. According to the complaint, "Carrico repeatedly profaned and racially insulted the plaintiff. The plaintiff complained to supervisor Roy Fanning and asked to be assigned elsewhere. Fanning refused to move the plaintiff. Fanning required Mr. Carnette to work with Carrico and be subjected to his verbal racial abuse." This caused plaintiff to suffer stress, anxiety, and panic attacks.

8. In September 2005, day shift production manager Ron Sisk notified plaintiff of an available first shift position and stated that "he would sign his approval for the transfer." Plaintiff requested the transfer through defendant's human resources department but never received a response.

9. During the late summer of 2005, plaintiff submitted several leave requests for the period September 27 through October 1 because his wife had oral surgery scheduled during that time. "Fanning repeatedly told the plaintiff that his written requests had been lost and that he needed to reapply. . . . Unbeknownst to the plaintiff," the leave request was eventually denied on the grounds that the maximum number of employees had already been approved for leave during that period.

10. Plaintiff, purportedly unaware that his leave request had been denied, took the days off as planned. While off, he noticed that his paycheck was smaller than normal and on approximately September 28 called defendant to inquire. He was referred to Hart, who "told the plaintiff he had been absent without permission and no longer had a job."

11. On September 29, 2005, human resources employee Brandy Graybeal told plaintiff that each of his leave requests had in fact been approved. On October 3, plaintiff spoke with Borie, who told him that the termination would be rescinded but that he would receive "disciplinary 'points'" for the days missed. Borie "suggested that Mr. Carnette take short term disability leave and get himself together."

12. Plaintiff went on short term disability, began psychiatric care, and eventually filed charges of discrimination and retaliation with the EEOC on April 3, 2006.

13. Plaintiff was terminated on April 6, 2006, upon the expiration of his short term disability.

3

14. After his psychiatrist released him to return to work in August 2006, plaintiff contacted Mr. Hitchman who told him that he would be allowed to return to work but without any accrued seniority. Plaintiff decided not to return to Exide.

Based on these allegations, plaintiff contends,

Exide's expressed indifference to the racially hostile environment, its escalating the hostile work environment, and its refusal to move the plaintiff to the day shift aggravated and increased Mr. Carnette's stress, anxiety, and panic attacks. The company's repeated and deliberate refusal to take any steps to end the open and notorious racist harassment made it physically and mentally impossible for the plaintiff to continue working at Exide and disabled him emotionally and mentally.

## II.

### Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party may discharge its burden by demonstrating that its opponent has failed to establish an essential element of that party's case for which it bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In order to defeat a motion for summary judgment, the non-moving party must present significantly probative evidence in support of

4

its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-movant's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255.

"It is well settled that the non-moving party must cite specific portions of the record in opposition to a motion for summary judgment, and that the court is not required to search the record for some piece of evidence which might stave off summary judgment." *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1191 (6th Cir. 1997). A party responding to a summary judgment motion "*must* . . . set out *specific facts* showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2) (emphasis added).

The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law, *Liberty Lobby* at 251-52, but at summary judgment it is not the court's role to weigh evidence or to determine credibility. *See id.* at 255. Nonetheless, "evidence in opposition to the motion that clearly is without any force is insufficient to raise a genuine issue." 10A Charles Allan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2727 (3d ed. 1998). Further, a party may not create a factual issue merely by contradicting his own prior testimony. *See Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986).

5

III.

*Motion to Strike*

A significant component of plaintiff's hostile work environment claim is the allegation that defendant forced him to continue working in close proximity to Carrico even though "Carrico repeatedly profaned and racially insulted" him. In its summary judgment motion, defendant cites plaintiff's deposition testimony as indicating that Carrico's actions were in fact only isolated events which were timely and curatively addressed by the employer. According to defendant, plaintiff's deposition testimony shows that Carrico only *spoke* one racial insult to plaintiff.

In response to this critical issue raised in the dispositive motion, plaintiff filed his "Affidavit of Anthony Carnette in Opposition to the Defendant's Motion for Summary Judgment" [doc. 19]. Therein, plaintiff in material part avers that after April 2005, "Carrio [sic] continued to profane and racially insult me. . . . Carrio [sic] repeatedly called me "Nigger" . . . . I repeatedly told supervisor Fanning what Carrio [sic] had been calling me and asked to be assigned elsewhere. . . . Fanning told me that he would not transfer me to another shift."

In response, Exide filed its "Defendant's Motion to Strike the Summary Judgment Affidavit of Anthony Carnette" [doc. 25]. Therein, defendant asks the court to disregard those portions of plaintiff's affidavit that purportedly are in direct conflict with his sworn deposition testimony. Defendant specifically cites plaintiff's affidavit claim that

6

Carrico spoke racially derogatory terms to him on more than one occasion. Defendant also cites certain portions of the affidavit pertaining to plaintiff's gas tank and his desired shift change.

Plaintiff has replied by filing "Plaintiff's Affidavit in Opposition to the Defendant's Motion to Strike" [doc. 28].[1]  In attempting to reconcile the seeming inconsistency between his prior affidavit and deposition statements pertaining to the frequency of Carrico's racial name-calling, plaintiff states,

> When I testified during my deposition that co-worker Michael Carrio [sic] had used the racist word "Nigger" one time when he told me that the company did not need a nigger supervisor, I was referring to that specific racist comment. . . . [Defense counsel] repeatedly focused upon Carrio's [sic] racist insult and the racist hate messages and locker episodes during this phase of his questioning. I answered [defense counsel's] questions based upon the time frame of his questions. Carrio [sic] only used the word "Nigger" once when he told me that the company did not need a nigger supervisor.

> But Carrio [sic] continued to harass and insult me racially after the three week time frame discussed by [defense counsel] during the deposition. . . .

To resolve defendant's motion to strike, the court deems it necessary to rather extensively quote plaintiff's deposition testimony in order to place the questions and answers in proper context. All of the cited questioning is by defense counsel unless otherwise indicated.

---

[1] Unless otherwise clarified, subsequent use of the word "affidavit" in this memorandum will refer to plaintiff's challenged affidavit filed in response to the summary judgment motion.

7

Q: Okay. Did you hear back from anybody else [commenting on the possibility of you becoming a supervisor]?

A: Well, I guess a lot of people knew it.

. . .

Q: Do you remember any of their names of people [sic] who asked you about it?

. . .

A: Michael Carrico and some of the lead men on – I can't think of the names. I mean, . . .

. . .

Q: Were any of them offensive in any way about it?

A: Yes.

Q: Who was?

A: Mr. Carrico.

Q: What did he say?

A: "We don't need a nigger supervisor."

Q: When did he say that?

A: See, he worked on the same line as I did and *he was always verbally abusive*. I – well, he would just belittle and berate me *all the time* and for some reason he was always working with me, you know, but . . . .

. . .

Q: Okay. Did you report Mr. Carrico for what he said?

A: Yes.

8

Q: About not needing a . . .

A: Yes, yes.

Q: Okay. Who did you report that to?

A: To Mr. Bourie [sic].

Q: Okay. And what did Mr. Bourie [sic] say?

A: I don't even know if they even talked to him about it.

Q: What did he say to you?

A: He said they would investigate.

. . .

Q: Okay. *Did Mr. Carrico ever say anything else that you found offensive?*

A: Well, you know, he had a little bit more time on the job than me. *He would – would constantly bicker*, "You son-of-a-bitch, you need to clean your acid out of your machine," or, you know, do this or do that, you know, but that, you know.

Q: And did he talk that way all the time?

A: Yes.

Q: Okay. Did he talk to everybody that way?

A: Only to me.

Q: Okay. Did you see him interact with other people?

A: What?

Q: Did you see him interact with other people?

A: *No.*

9

Q: Okay. How many times did you report him to Mr. Bourie [sic] for any kind of offensive behavior?

A: Several.

Q: Several times?

A: Yes.

Q: Okay. Tell me about each one – each occasion you reported him and exactly what you reported him for.

A: [Discusses Mr. Carrico's alleged involvement in the locker vandalisms].

. . .

Q: Okay. Now these co-workers, let me ask you, did you tell Mr. Bourie [sic] that you thought Carrico had done it?

A: Yes.

. . .

Q: And then there was another time when he said that about not needing a supervisor of a specific race and you said that was a separate report, is that right?

A: Right.

Q: Okay. Were there any other occasions where you reported Mr. Carrico to Mr. Bourie [sic]?

A: No.

Q: Okay. Were there any other occasions where you reported anything concerning, I think, his conduct or, you know, anything related to your race to Mr. Bourie [sic]?

A: Yes. [further discusses the locker incidents].

10

. . .

Q: Now of the three things that we've talked about so far, can you tell me what order they happened in?

A: The clothes – first the clothes, they were put into another locker, then the next day the "I hate niggers" or the "We hang niggers" note was in my locker and then the next – on the next one . . .

Q: The other thing we were talking about was his statement about not needing a supervisor.

A: Right.

Q: Was that before or after the incident with the lockers?

A: That was before.

Q: Okay. How much before?

A: Maybe three weeks, maybe a month.

Q: Okay. Did you ever report Mr. Carrico to Mr. Bourie [sic] for anything else other than these three events we've talked about?

A: There was a "I hate niggers" scratched on my locker. Then there was another note "The KKK is coming" or something in my locker. I reported them but . . .

Q: You didn't know who?

A: No.

. . .

Q: Okay. *Did Mr. Carrico say anything offensive that we haven't already discussed?*

A: *No.*

11

. . .

Q: Okay. Mr. Carnette, you and I have discussed a variety of different things today in terms of things that happened, things that were said or done that were offensive to you. *Have we missed anything? Did anything else happen that you found to be offensive on a racial basis or you thought was done to intimidate you on a racial basis? Any other acts or statements of harassment?*

A: Well, all of it, at some point, rolled around to the supervisor's position that was going to be offered and I feel like all of that ties into it because it's racial intimidation and I felt like all of them had their hands were in it [sic], everyone that's mentioned.

. . .

Q: *Any other specific incident of harassment in any form that we've missed?*

A: Other than the fact that – like I just said, I felt like Mr. Fanning had the power to get me out of the situation because of the supervisor's position he let it continue and kind of kept a blind eye to it.

. . .

Q: Okay. And I understand that you were saying that you believe they could have gotten you out and they didn't. *Are there any other specific acts or incidents – things that occurred that you believe were harassment that we haven't talked about already?*

A: *No*.

. . .

Q: Okay. So starting in the winter and then the rest of these events [locker incidents] played out over the next three weeks or so?

A: Yes, yes.

. . .

12

Q: Well, the events we talked about, the things being put on his locker, his locker being scratched, the notes being put in his locker, all the different events of harassment, you know, that we've talked about.

[Plaintiff's counsel]: And he talked about Carrico's mouthing off but that happened all the time.

Q: Well, okay, as far as Carrico saying the different things but I believe you said the part about what he said about supervisor happened before all of the events on the locker and . . .

A: Yes.

Q: . . . different things, right? And the other statements that he made to you, but you *he [sic] did say that one offensive word* . . .

A: Yes.

Q: . . . *on that occasion* about not needing a supervisor?

A: Right.

Q: *The other things that you described to me were not racial terms, were they?*

A: <u>No</u>. Like he called me S.O.B. or M.F. I thought he was trying to badger me into fighting and losing my job, is what I – is how I saw it and it was better for me to walk away, you know, instead of retaliate in that manner.

. . .

[Questioning by plaintiff's counsel]

Q: Now did you – did you complain to Mr. Fanning about Mr. Carrico's racial comments and uncomplimentary comments to you?

A: Yes.

Q: And did you ask Mr. Fanning to assign you some place else away from Mr. Carrico?

A: Yes.

Q: Did he ever do that?

A: No.

Q: How did he find Mr. Carrico – regardless of where you were when you were doing your job, where was Mr. Carrico?

A: He would always assign – Mr. Fanning would always assign Mr. Carrico with me.

Q: So he was always in proximity to you?

A: Right.

[Carnette Deposition, p. 72-74, 76-78, 81-84, 86, 99-101, 105-06, 133-34] (emphasis added).

Having considered the deposition testimony cited above, the court must grant defendant's request to disregard that portion of the affidavit pertaining to Carrico's racially offensive oral statements. Again, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity. . . . To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's" acceptance. *Cleveland v. Policy Mgmt. Sys.*, 526 U.S. 795, 806-07 (1999); *see also Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006) (A plaintiff's contradictory post-deposition affidavit may be considered "if the nonmoving party was confused during the deposition or has some other legitimate justification," such as where the issue was not

14

fully explored at deposition.).   The justification offered by the nonmovant must be "persuasive."  *Aerel*, 448 F.3d at 908.

Plaintiff's affidavit is in obvious conflict with his sworn deposition testimony. The testimony, read in context and as a whole, is clear that Carrico only made one oral statement to plaintiff pertaining to race.   All other oral statements were not racial, by plaintiff's own admission.   All other racial insults - the graffiti and locker notes - stopped completely, as will be discussed below, after defendant timely addressed the issue in a meeting shortly after the three-week March 2005 period when the vandalism took place.

Plaintiff's attempted explanation for the conflicting testimony - that he thought he was only being questioned about March 2005 - is unpersuasive.   Repeatedly, defense counsel broadly asked plaintiff at his deposition if there were any other incidents of racial harassment that had not been discussed.   Plaintiff had ample opportunity to testify that Carrico "repeatedly" or "constantly" directed racially offensive language at him, but plaintiff did not do so.   Plaintiff affirmatively testified that Carrico verbally used the word "nigger" only one time, and that all of Carrico's other bothersome language did not involve racial terms.   In addition, plaintiff testified that Carrico would "constantly bicker," was "always verbally abusive," and would "just belittle and berate me all the time*."*   Use of the words "constantly," "always," and "all the time" evidences that plaintiff was discussing more than

just the three-week locker vandalism period of March 2005.[2]  As for the locker incidents, plaintiff admittedly only *suspects* that Carrico was involved.

For these reasons, the portion of plaintiff's affidavit pertaining to Carrico's racially offensive oral statements will be disregarded.  Plaintiff's proffered explanation for the contradictions is neither "persuasive" nor "sufficient to warrant a reasonable juror's" acceptance.  The explanation - that he thought that the questioning at his deposition pertained only to a three week period - is simply not plausible.

Defendant's motion will also be granted as it pertains to plaintiff's gas tank.  In his affidavit, plaintiff states in material part, "I saw that my truck's gas tank had been punctured while parked in the company's lot.  I began fearing that a racially hostile co-worker would tamper with my vehicle's brakes or would commit some other racist act . . . .  After my gas tank had been punctured . . . ."  These statements directly contradict plaintiff's deposition testimony, where he admitted to having no knowledge of how or where his vehicle became damaged:

---

[2]  The court cannot even infer that Carrico's "constant bickering" and use of terms such as "son of a bitch" were based on plaintiff's race.  Although plaintiff testified that Carrico spoke in that manner only to him, plaintiff also testified - somewhat improbably - that he never heard Carrico interact with any other person.  Again, "evidence in opposition to the motion that clearly is without any force is insufficient to raise a genuine issue."  10A Charles Allan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2727 (3d ed. 1998).  It is also noteworthy that plaintiff's comprehensive, three-page EEOC charge makes no mention of Carrico outside the context of the locker room incidents.

16

Q: Okay. You mentioned that your truck's gas tank was punctured at some point?

A: Yes.

Q: Okay. How did you discover that?

A: I was coming out from work going home and there was a puddle of gas under it.

Q: In the parking lot?

A: Yes.

Q: At Exide?

A: Yes.

Q: And did you actually see the puncture marks or how did you figure out what had happened?

A: Well, I didn't . . . if you're asking me who do you think did it or if something other than a puncture wound did it, I couldn't tell you.

Q: Okay, you don't know for a fact . . .

A: No, I don't.

Q: . . . that it was even punctured?

A: Right.

Q: Okay. And then as you mentioned earlier, machinery fell sometimes and things happen?

A: Right, right.

Q: So it could have been just a leak?

A: It could have been or a rock could have come back and hit it or, you know.

17

[Carnette Deposition, p. 96-97]. Additionally, in his affidavit in response to the motion to strike, plaintiff reaffirmed that he has no knowledge of what actually happened to his truck. In attempting to explain any contradictions in his testimony, he states less than persuasively that "[t]he gas tank puncture occurred shortly after the racist locker episodes and I was anxious about my safety at Exide." Defendant's motion will accordingly be granted as it pertains to plaintiff's statements relating to his gas tank, and the court will not consider that portion of the affidavit in ruling on defendant's motion for summary judgment.[3]

IV.

*Summary Judgment Analysis*

As noted, plaintiff alleges that, on the basis of his race, defendant subjected him to disparate treatment, retaliation, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, and 42 U.S.C. §§ 1981 and 1981a. Title VII makes it unlawful for most employers to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Additionally, under Title VII it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this

---

[3] Defendant also seeks the exclusion of affidavit statements pertaining to the September 2005 shift change denial. Even if considered, those statements would not create a genuine issue of material fact. The court therefore need not address their exclusion.

18

subchapter." 42 U.S.C. § 2000e-3(a). Section 1981 provides in material part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. 1981(a).

As an initial matter, the court notes defendant's argument that many of plaintiff's allegations are barred due to his purported failure to exhaust the administrative remedies required by Title VII. That theory is incorrect. The conduct in this case is covered both by Title VII and by § 1981. "Where conduct is covered by both § 1981 and Title VII, the detailed procedures of Title VII [exhaustion of administrative remedies] are rendered a dead letter, as the plaintiff is free to pursue a claim by bringing suit under § 1981 without resort to those [Title VII] statutory prerequisites." *Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989), *overruled in part on other grounds by* The Civil Rights Act of 1991 §101, 42 U.S.C. § 1981. In addition, claims brought under § 1981 are subject to a four-year statute of limitations, which plaintiff has easily met in this case. *See Jones v. R.R. Donnelly & Sons*, 541 U.S. 369, 382-83 (2004); 28 U.S.C. § 1658(a).

A. *McDonnell Douglas*

At summary judgment, the court evaluates a Title VII claimant's inferential and circumstantial evidence using the familiar *McDonnell Douglas* burden-shifting approach. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Claims brought under § 1981

19

are analyzed using that same evidentiary framework. *See Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 418 (6th Cir. 1999).

In *McDonnell Douglas* the Supreme Court established "the order and allocation of proof in a private, non-class action challenging employment discrimination . . . ." *McDonnell Douglas*, 411 U.S. at 800-03. Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. *Id.* at 802. The elements necessary to make a *prima facie* showing will vary depending on the facts of each case and the type of discrimination alleged. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 575-76 (1978). "The key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007).

Plaintiffs bear the burden of persuasion throughout the entire process. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 793 (6th Cir. 2000). If a plaintiff is able to establish his *prima facie* case, the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* at 792-93 (citation omitted). If the employer successfully provides such a reason, *McDonnell Douglas*'s regime then places the final burden on the plaintiff to "demonstrate by competent evidence" that the employer's proffered reason is in fact merely a pretext. *McDonnell*

*Douglas*, 411 U.S. at 805. Pretext may be shown "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

### B. Disparate Treatment

To establish a *prima facie* case of racial discrimination, plaintiff must show that he: (1) is a member of a protected class; (2) was qualified for his job; (3) suffered an adverse employment action; and (4) either was replaced by someone outside the protected class or was treated differently than similarly situated nonprotected employees. *See Newman v. Fed. Express*, 266 F.3d 401, 406 (6th Cir. 2001). Plaintiff has satisfied the first prong and, unless specifically addressed, the court will presume that he has satisfied the second.

Initially, the court must note with some frustration that plaintiff's summary judgment response contains essentially no structured briefing in regards to setting forth a *prima facie* case on any of his disparate treatment allegations. Seemingly, plaintiff has abandoned that claim. Nonetheless, the court will address the allegations that could arguably be construed as disparate treatment.

Turning first to plaintiff's contention that defendant "discriminatorily reduced" his pay from "$10.20 per hour 'plus production'" down to $7.98 per hour "without advising him of the decrease," a reduction in pay can be an adverse employment action. *See, e.g., Martin v. Toledo Cardiology Consultants*, 548 F.3d 405, 412 (6th Cir. 2008). Plaintiff has,

21

however, made no showing that any other employee - let alone a similarly situated nonprotected employee - was treated differently. He has therefore failed to make out a *prima facie* case of discrimination.

Moreover, defendant has articulated a legitimate, nondiscriminatory reason for the "decrease." The affidavit of defendant's human resources employee Andrea Russell explains that Exide's production workers receive a higher *hourly* wage during their first ninety days of employment because those employees are less likely to earn production bonuses during that period. Plaintiff's hourly pay rate was decreased after his ninetieth day of employment consistent with that policy. Ms. Russell's review of plaintiff's payroll information indicates that, because of production bonuses, his gross weekly wages actually *increased* after the alleged pay "decrease." Defendant has also submitted a personnel document signed by plaintiff at the time of his hiring which reads in part, "My pay has been explained for my position and I understand that my starting wage is 10.20/hr and provided that my performance is satisfactory to the company, I will top out at 8.52+/hr [p]lus production." Plaintiff has made no attempt to show that defendant's explanation is pretextual.

As for the failure to promote claim, plaintiff's *prima facie* burden is to show that: (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) an unprotected employee of similar qualification received the promotion, or the position remained unfilled.

*Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006); *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007). In his affidavit, plaintiff states, "During early 2005, I heard a supervisory position on my shift was coming open." An April 18, 2005 email from Borie to Cain "recommend[s] that you talk to [plaintiff] as a future Supervisor candidate." Plaintiff has, however, offered no evidence that any "future" supervisory position ever in fact came open, that he applied for the job, that another person was instead hired, or that the position is still vacant. Plaintiff has thus failed to make out a *prima facie* case.

As for the denials of shift transfer and time off, even if the court were to presume that those denials were adverse employment actions under the circumstances of this case, plaintiff has not endeavored to show that any nonprotected person was treated any differently. He has again failed to make out his *prima facie* case.

Similarly, with regards to both his April 2006 termination and the August 2006 offer to rehire without the benefit of accrued seniority, plaintiff has not shown that he was replaced by someone outside the protected class or that he was treated differently than similarly situated nonprotected employees. In addition, plaintiff was not qualified for his position in April 2006, because his psychiatrist did not release him to return to work until four months later. Further, plaintiff was terminated in April 2006 upon the expiration of his twenty-six weeks of short-term disability benefits. Defendant's short-term disability procedures state in material part that an employee who "is unable to return to work after

23

exhausting the 26 week short-term disability benefit . . . will be terminated from active service." Similarly, defendant's length of service policy states that seniority terminates upon "[m]edical leave of absence (i.e. Short Term Disability) that exceeds benefit plan." Plaintiff has made no effort to rebut these legitimate, nondiscriminatory justifications. Summary judgment will therefore be granted in full on plaintiff's disparate treatment claim.

## C. Hostile Work Environment

To establish his *prima facie* case of a racially hostile work environment, plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his race; (4) the harassment unreasonably interfered with his work by creating a hostile, intimidating, or offensive environment; and (5) the employer is liable. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009). In analyzing the fourth prong, the court must take into account the totality of the circumstances considering "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, [as opposed to] a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 515 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)). As for the fifth prong, "[a]n employer is liable if it knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate corrective action." *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999) (citation and quotations omitted).

Title VII is not a "general civility code." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998). "[T]he conduct in question must be judged by both an objective and a subjective standard: [t]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) (citation omitted).

Although it is necessary in this case to review plaintiff's many allegations individually to some degree, the court is simultaneously mindful that it must consider the totality of the circumstances in deciding whether plaintiff suffered an actionable hostile work environment. *See id.* "[T]he issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether - taken together - the reported incidents make out such a case." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) (emphasis in original).

Several of the circumstances of this case cannot reasonably be considered race-based harassment. Those circumstances include the "discriminatory pay reduction," the single unexplained appearance of "what appeared to be 'snot'" on plaintiff's locker which plaintiff did not even report, and the unexplained gas tank leak. Plaintiff simply has not demonstrated that these incidents were harassing or connected to his race.

To be certain, the three weeks of locker vandalism that plaintiff endured in March 2005 were reprehensible and would satisfy the first four elements of a *prima facie*

25

case. At the fifth prong, however, plaintiff fails to show employer liability. Again, "[a]n employer is liable if it knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate corrective action." *Hafford*, 183 F.3d at 513. Plaintiff's deposition testimony makes clear that Fanning timely addressed the problem by conducting a meeting emphasizing Exide's anti-harassment policy. Plaintiff received no further vandalism or racist messages after that meeting.

Similarly, coworker Daniel Horsey's "coon" comment was corrected by defendant. Horsey was terminated within two days because of the insult.

Thus, plaintiff has shown only a single racially-offensive statement made to him by Carrico, in addition to the promptly corrected locker and "coon" incidents. Isolated offhand comments, unless extremely serious, do not amount to discriminatory changes in the terms and conditions of employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998). As discussed above, the court cannot infer that Carrico's "constant bickering" and use of terms such as "son of a bitch" were based on plaintiff's race. Although plaintiff testified that Carrico spoke in that manner only to him, plaintiff claims to have never heard Carrico interact with any other person.

Plaintiff also cites statements made to him by Tomica Hinton, a black corporate human resources representative of defendant. According to plaintiff, in March 2006 after plaintiff told her many of the circumstances at issue in this lawsuit,

26

Ms. Hinton told me that she had been at Exide in Bristol for 2 days and knew exactly what I was talking about.

I told Ms. Hinton I was going to sue Exide. She said she did not blame me. She said that Exide needed to "get their stuff together" because Bristol was a "terrible" place.

Ms. Hinton's ambiguous statements are of minimal value to plaintiff in establishing an actionable hostile work environment. Plaintiff does not explain to what Ms. Hinton was referring. If anything, it would appear most likely that she was commenting on a general atmosphere. The court cannot treat all incidents of harassment of African-American employees as evidence that plaintiff himself experienced a hostile work environment. *See Barrett*, 556 F.3d at 515. Instead, the only harassment relevant herein is those acts directed toward plaintiff and of which plaintiff was actually aware. *See id.*

For the reasons discussed herein, the facts construed in the light most favorable to plaintiff, viewed in their totality, do not rise to the level of an actionable hostile work environment. Summary judgment is therefore appropriate on that claim.

## D. Retaliation

Claims of retaliation are also analyzed under the *McDonnell Douglas* burden-shifting framework. *See DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004). To demonstrate a *prima facie* case of retaliation under Title VII, a plaintiff must prove: (1) he engaged in activity protected by Title VII; (2) the exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against plaintiff or subjected him to severe or pervasive retaliatory harassment; and (4) there was a causal

27

connection between the protected activity and the adverse employment action." *Barrett*, 556 F.3d at 517; *see also Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) ("[A] plaintiff must show that . . . the challenged action . . . well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.") (citations and quotations omitted).

Once the plaintiff has made out a prima facie case, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for its actions. *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002). If the employer articulates such a reason, the burden returns to the plaintiff to demonstrate that the proffered reason is pretextual. *Id.* The ultimate burden of persuasion remains with the plaintiff at all times. *Id.*

Plaintiff engaged in protected activity known to the defendant when, in March 2005, he complained of harassment, and again on April 3, 2006, when he filed his charge with the EEOC. The court will further presume that most of the challenged actions - denial of the requested shift change, the firings, and offering to rehire but without accrued seniority - "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[4]

---

[4] The court cannot conclude that plaintiff's "failure to promote" allegations rise to the *Burlington Northern* standard. Plaintiff states that in "early 2005, I heard a supervisory position on my shift was coming open. . . . Borie told me . . . that he thought I could do the job." Plaintiff also states that Cain did not "talk to [him] as a future Supervisor candidate" as recommended by Borie. Plaintiff's evidence of a "future" supervisory position that might be "coming open" is speculative and illusive. There is no indication that any job ever came open; that plaintiff ever pursued a "future" position any further; that any other person was ever promoted; or that the job remained

(continued...)

As for the final element of plaintiff's *prima facie* case, in determining whether a causal connection exists the court "may consider whether the employer treated the plaintiff differently from similarly situated individuals and whether there is a temporal connection between the protected activity and the retaliatory action." *Barrett*, 556 F.3d at 517. Despite "tension in Sixth Circuit law on whether proximity alone may *ever* suffice to show causation, there is a consensus that proximity alone generally will not suffice where the adverse action occurs more than a few months . . . after the protected conduct." *Hamilton v. Starcom Mediavest Group*, 522 F.3d 623, 629 (6th Cir. 2008) (emphasis in original). It is the plaintiff's burden to produce sufficient evidence from which a causal connection can be inferred. *See Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 563 (6th Cir. 2004).

For the most part, plaintiff has not offered persuasive argumentation on this point. The denial of the requested shift change, the October 2005 firing, and the offer to rehire were simply too temporally distant from his protected activity to establish the necessary causal connection. However, the April 6, 2006 termination and the April 3, 2006 filing of his EEOC charge certainly have the necessary temporal proximity. Plaintiff has therefore made out a *prima facie* case of retaliation.

The burden thus shifts to defendant to offer a legitimate, nondiscriminatory reason for the termination. As discussed above, defendant has done so. Plaintiff's

---

[4](...continued)
open. *See Burlington*, 548 U.S. at 68 ("And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence.") (citation omitted).

psychiatrist did not release him to return to work until August 2006, and he was terminated in April of that year upon the expiration of his twenty-six weeks of short-term disability benefits pursuant to defendant's short-term disability procedures. Plaintiff has made no effort to rebut this legitimate, nondiscriminatory explanation. Summary judgment must therefore be granted on plaintiff's disparate treatment claim.

An order consistent with this opinion will be entered.

ENTER:

_____s/ Leon Jordan_____
United States District Judge